**WEBBER OIL COMPANY**

v.

**Robert MURRAY and Carolyn Murray.**

Supreme Judicial Court of Maine.

Argued Sept. 21, 1988.

Decided Dec. 20, 1988.

Edith A. Richardson (orally), Paul W. Chaiken, Dawn M. Pelletier, Rudman & Winchell, Bangor, for plaintiff.

Alfred C. Frawley (orally), Brann & Isaacson, Lewiston, for defendants.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

HORNBY, Justice.

This case requires us to determine whether the federal Petroleum Marketing Practices Act preempts Maine's Motor Fuel Distribution and Sales Act when it comes to a distributor's obligation to give written

notice before terminating a franchise agreement. We conclude that in the context of this particular franchise agreement it does not. We also resolve a variety of other issues generated in the course of a six day trial.

Robert Murray owned Grandma's Outlet, a convenience store in East Holden. Webber Oil Company agreed to make Exxon gasoline available for sale to the public through pumps Webber owned on the premises of Grandma's Outlet. Although Murray and Webber used confusing documents to reflect their relationship, their behavior clearly demonstrated that they had entered into a consignment or commission agreement for gasoline products. Specifically, Webber delivered gasoline to Grandma's but retained ownership. Murray staffed the pumps, sold the gasoline, paid the proceeds to Webber and received a commission on each gallon sold. During their relationship Murray also borrowed money from Webber, and both he and his wife signed promissory notes.

After a few months, trouble arose. Webber claims that Murray refused to turn over the amounts he had collected in selling Webber's gasoline. Murray claims that Webber wrongfully prevented him from setting the pump price for gasoline and that he withheld payments only to get Webber's attention and compel it to comply with his view of the law and their agreement. Ultimately, Webber locked the gasoline pumps and brought suit against both Murrays on the promissory notes and against Robert Murray on one of the contracts. Robert Murray counterclaimed accusing Webber of violating the contract, Maine antitrust laws and the Maine Motor Fuel Distribution and Sales Act. 10 M.R.S.A. §§ 1451–1457 (1980 & Supp.1988) In Superior Court (Penobscot County; *Browne, J.*), a jury returned a verdict in favor of Webber on all counts. Judgment was entered accordingly. The Murrays have appealed.

### Preemption

Murray argues that he is entitled to damages because Webber failed to give him advance written notice of termination as required by Maine law. Webber contends that federal law supersedes the Maine statute and therefore prevents Murray from succeeding on this claim. In 1975 the Maine Legislature passed the Motor Fuel Distribution and Sales Act in response to the then recent gasoline crisis. Seeking to increase "competition at all levels of the motor fuel market" and to preserve the existence of independent retailers, 10 M.R.S.A. § 1452, it regulated "the relationship between parties to franchise agreements involving a sale or distribution of motor fuels in the State." *Id.* Among other things, it required that a franchisor give a franchisee advance written notice of termination. 10 M.R.S.A. § 1454(3). The statute applies to franchise relationships between a "distributor" and a "retail dealer." Webber clearly fits the definition of distributor, 10 M.R.S.A. § 1453(3), the contract here is a franchise relationship, and Murray fits the definition of retail dealer, since the term is expansively defined to mean "any person who operates a service station, filling station, store, garage, or other place of business for the sale of motor fuel for delivery into the service tank or tanks of any vehicle propelled by an internal combustion engine." 10 M.R.S.A. § 1453(11). Thus, Murray has a right to written notice under the Maine statute unless it is preempted by federal law.

In 1978, in response to concerns similar to those of Maine but also in search of nationwide uniformity, Congress passed the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2841 (PMPA). Like the Maine statute, the federal legislation seeks to regulate the franchise relationship, but it imposes restrictions that are somewhat different from those of the Maine statute. With respect to such differences it states:

> To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise ... no State ... may adopt, enforce, or continue in effect any provision of any law or regulation ... with respect to termination (or the furnishing of notification with respect thereto) of any such fran-

chise ... unless such provision of such law or regulation is the same as the applicable provision of this subchapter. 15 U.S.C. § 2806(a). The parties agree that the state and federal provisions concerning notice of termination are not "the same." The issue, therefore, is whether a provision of the PMPA "applies." If it does, it preempts the state law. If it does not, by the federal statute's own terms there is no preemption. As the Senate Committee on Energy and Natural Resources stated in recommending adoption of the federal statute, "[t]o the extent that the provisions of Title I do not apply to an aspect of the franchise relationship, State laws dealing with such aspects of the relationship are not preempted." S.Rep. No. 731, 95th Cong., 2nd Sess., 42 *reprinted in* 1978 U.S.Code Cong. & Admin.News 873, 900. *See Esso Standard Oil Co. v. Department of Consumer Affairs*, 793 F.2d 431, 434 (1st Cir.1986) (Congress expressly set out in this provision the scope of any preemption); *Bellmore v. Mobil Oil Corp.*, 783 F.2d 300, 304–05 (2nd Cir.1986) (preemption effect limited).

■ Like the Maine statute, the federal law deals with franchise relationships between a distributor and a retailer and it is clear that Webber is a distributor. The federal definition of retailer, however, is narrower. Specifically, the term means "any person who purchases motor fuel for sale to the general public for ultimate consumption." 15 U.S.C. § 2801(7). Under the Murray–Webber agreement, Murray does not purchase motor fuel from Webber. Instead, he sells Webber's product, pays Webber the proceeds, and receives a com-

mission. Thus, the federal statute on its face does not apply to the Webber–Murray kind of relationship, and state regulation is therefore not preempted. *See Automatic Comfort Corp. v. D & R Service, Inc.*, 627 F.Supp. 783, 784 (D.Conn.1986) (state may regulate relationships that are not franchises under PMPA.) [1]

■ Murray can pursue this claim even though at trial he argued that he had enough characteristics of an independent dealer to have standing to bring an antitrust law pricefixing claim under *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). That position is not inconsistent with Murray's contention that he is not a purchaser from Webber under the PMPA. Even if it were inconsistent, Murray was entitled to present the alternative possibilities to the jury so that the jury might choose between them.

Contrary to Webber's argument, there was also no waiver. Before trial, Murray moved for summary judgment on his state law counterclaims (both his pricefixing and notice of termination claims) under the Motor Fuel Distribution and Sales Act, arguing that the facts were undisputed. Webber also moved for summary judgment on the grounds that federal law preempted the state cause of action. The Superior Court (Silsby, J.) denied both motions without explanation, and the case went to trial. The trial briefs raised the preemption issue again. Murray's lawyer referred to the state law claims including the notice issue in his opening argument before the jury and throughout the trial. After the evidence was closed, the trial judge stated on the record that the federal statute preempt-

---

1. Cases that have looked beyond the plain language of the federal statute to consider, as an alternative to proof of purchase, "significant indicia of entrepreneurial responsibility in the station operator and a showing the station operator is at substantial market risk," *Sigmon v. Widenhouse Service, Inc.*, 638 F.Supp. 808, 811 (M.D.N.C.1986) have nevertheless found no federal coverage in factual circumstances having some resemblance to Murray's. *E.g. Id.*, (The plaintiff, operator of a convenience store owned by the defendant, sold the defendant's gasoline on consignment and was paid a commission for each gallon sold; the defendant bore the risk as to the sale of the gasoline.); *Sanna v. Friendly*

*Service Stations, Inc.*, 593 F.Supp. 493 (D.Conn. 1983) (The plaintiffs were paid a fixed weekly salary with the possibility of a bonus for managing two service stations and were responsible for loss resulting from, for example, improper credit charges, but the defendant bore all risk regarding over budget operations.); *Johnson v. Mobil Oil Corp.*, 553 F.Supp. 195 (S.D.N.Y.1982) (The defendant paid the plaintiff service station operator a set monthly salary as well as a commission based on the volume of gas sold and was responsible for most economic costs; the plaintiff was responsible for running the station.).

ed the state statute on notice of termination. He therefore declined to instruct the jury on that issue and the parties' closing arguments did not deal with it. Thus, Murray did all that he could under the circumstances.

We conclude, therefore, that Murray was entitled to have his state law notice issue go the jury for any damages that might result.

### Common Law Fiduciary Duty of Fair Dealing

■ The trial court refused to submit to the jury Murray's claim that Webber breached a common law fiduciary duty of fair dealing in terminating Murray. Specifically, Murray sought an instruction that "in terminating the contract, [Webber] must act reasonably and in a way so as to minimize the harm and disadvantage to the franchisee whose business [it] is cutting off." A limited number of jurisdictions have recognized a fiduciary duty in a franchise relationship. *E.g., Arnott v. American Oil Co.,* 609 F.2d 873, 884 (8th Cir. 1979) *cert. den.,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980); *ABA Distributors, Inc. v. Adolph Coors Co.,* 542 F.Supp. 1272, 1285–86 (W.D.Mo.,1982). *But see Murphy v. White Hen Pantry Co.,* 691 F.2d 350, 355–356 (7th Cir.1982). Maine, however, recognizes a fiduciary obligation only when "the relations between two persons are such that one is completely dependent and relies upon and necessarily reposes confidence in the other." *Small, Adm'r v. Nelson,* 137 Me. 178, 182, 16 A.2d 473, 475 (1940). *See also Ruebsamen v. Maddocks,* 340 A.2d 31, 35 (Me.1975); *Rosenthal v. Rosenthal,* 543 A.2d 348, 351 (Me.1988). The evidence here showed no such relationship, but rather only a conventional business deal. Certainly one party was economically stronger than the other, but that is often the case in a business deal, and not the basis for a finding of a relationship of confidence. *See Clappison v. Foley,* 148 Me. 492, 497–99, 96 A.2d 325, 327–28 (1953). Since there was no factual showing of the fiduciary or confidential relationship that our cases have required before imposing the extra obligation, the trial judge properly declined Murray's proposed instruction.

### Motion for Directed Verdict on the Pricefixing Claim

Murray maintains that the trial judge improperly denied his motion for a directed verdict on his pricefixing counterclaim under Maine's Motor Fuel Distribution and Sales Act. At the close of Webber's direct case, Murray moved for a directed verdict. That motion clearly applied only to Webber's claims and the motion was denied. At the close of Murray's case, including both his defenses to the action and his counterclaims, Murray renewed his motion for a directed verdict stating through counsel: "Again, just for the record, your honor, we would renew our motion for directed verdict *on plaintiff's case in chief* based upon the status of the record at the close of the defendant's case, as well" (emphasis supplied). That motion, restricted likewise to Webber's claims, was also denied. Finally, at the close of all the evidence, Murray stated through counsel: "Counterclaimant/defendant would like to move for directed verdict now at the close of all the evidence pursuant to Rule 50, both for the reasons stated previously on the record and in chambers."

■ M.R.Civ.P. 50(a) is clear: "A motion for a directed verdict shall state the specific grounds therefor." This Court has no idea what the lawyers stated in chambers. The "reasons stated previously on the record" are limited to those in connection with the motions for directed verdict on Webber's claims alone. Consequently the record does not show that Murray ever sought a directed verdict on his counterclaim, let alone the specific pricefixing component of that claim. We have searched the record in vain for any suggestion that Murray alerted the trial judge to his arguments for a directed verdict on the pricefixing claim. We conclude that Murray therefore failed to preserve the issue for appellate review. *Knowles v. Jenney,* 157 Me. 392, 396, 173 A.2d 347, 349 (1961).

### Jury Votes

■ Murray complains that the trial judge incorrectly instructed the eight-member jury that to return a verdict, at least the same six jurors must agree on each question posed to them. Since all eight jurors were unanimous on each question, any prejudice to Murray is only speculative. We therefore decline to decide this issue.

### Motion to Set Aside Judgment

After the trial, Murray obtained a copy of an earlier letter from Webber's lawyers to Webber advising it against the type of arrangements it had with Murray and giving the legal opinion that the state pricefixing provisions prohibited them. Murray thereupon brought a motion under M.R. Civ.P. 60(b) to set aside the judgment. He claimed that it was improper under M.R. Civ.P. 11 for Webber's lawyers to persuade the trial judge of a legal position contrary to what they had advised their client, that the information was improperly withheld during discovery, and that the jury was misled by certain testimony about Webber's knowledge. We reject these arguments.

■ It is this Court that determines what the law is, not the opinions of private legal counsel. The fact that a lawyer gives a client advice does not prevent that lawyer from later defending the client if the client chooses not to follow the advice. In doing so, the lawyer is entitled to attempt to persuade a court that the advice initially given was ultimately wrong. Any other conclusion would totally disrupt the process of advising clients on the law. Obviously, lawyers frequently advise clients conservatively to avoid risks. Within our adversary system, however, nothing is gained in preventing the lawyers from arguing strenuously that their client's contrary actions were justified under the law. There is no suggestion that good grounds were lacking for the two different positions taken by Webber's lawyers here, and the history and outcome of this litigation demonstrate the contrary. We find no violation of Rule 11.

■ So far as the alleged discovery violations are concerned, Webber's lawyers did respond to the initial request for all such documents by raising the issue of privilege. Murray never brought any motions to compel discovery and therefore did not satisfy the "due diligence" requirement of M.R.Civ.P. 60(b). *See Town of Eliot v. Burton*, 392 A.2d 56, 59 (Me.1978). The failure to disclose the author and recipients of the opinion letter in response to a general interrogatory seeking identification of "each party with knowledge of Webber's use of consignment agreements" was not clearly fraud, misrepresentation or misconduct under M.R.Civ.P. 60(b)(3).

Finally, the trial testimony challenged by Murray is not misleading when read in context.

We conclude that the trial judge did not abuse his discretion in denying the motion.

### Attorney Fees

The trial judge awarded Webber attorney fees in the amount of $12,315.65. (Both the promissory notes and the contractual documents underlying Webber's claim provided for attorney fees.) We review the award only for an abuse of discretion. *Poussard v. Commercial Credit Plan*, 479 A.2d 881, 884 (Me.1984).

■ Murray has three basic complaints about the fee award: that the trial judge failed to make findings; that the affidavits in support of the fee request contain insufficient detail; and that the award impermissibly includes fees incurred in defending against the counterclaim. Murray's failure to request findings disposes of the first issue, and we turn to the other two.

■ Although detail is helpful in our review of a request for attorney fees, we see no reason to insist that such detail always be provided at the outset of an application for fees: the amount may turn out not to be subject to serious challenge. Here Murray responded to Webber's first affidavit with a legal memorandum complaining of insufficient detail and the inclusion of services on the counterclaim. As a

result, Webber filed a supplemental affidavit with greater detail. So far as the record demonstrates, Murray did not object to this second affidavit and seek further detail. A hearing was held on April 1, 1988, with a court reporter present but Murray has not made the transcript part of the record on this appeal. Under these circumstances, we find Murray's claims of insufficient detail unpreserved.

■ The affidavits provided a reasonable explanation of the allocation of fees between the complaint and the counterclaim. It appears that the trial judge accepted the unopposed assertions and arithmetic of the second affidavit yielding a total fee of $12,371.23 for services that did not include defending against the counterclaim. Since the affidavit also revealed that a one-third fee was a customary and reasonable fee in a collection case, he then reduced the fee to that lower amount, in this case, $12,315.65. We find no abuse of discretion.

In light of our action vacating the judgment on Count I of the counterclaim, Webber's request for attorney fees on appeal is denied.

The entry is: Judgment vacated on Count I of counterclaim and remanded for further proceedings consistent with the opinion herein; judgment affirmed in all other respects.

All concurring.