STATE OF MAINE                          BUSINESS AND CONSUMER COURT

Cumberland, ss.


CHRISTOPHER J. LUNNY

      Plaintiff

    v.                                          Docket No. BCD-CV-11-20
                                                  *AMH-CUM- ᴄ/31/2011*
H. A. MAPES, INC.

      Defendant


## ORDER ON DEFENDANT'S MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR LEAVE TO AMEND

This action arises out of one or more contracts between Plaintiff Christopher Lunny ["Lunny"] and Defendant H. A. Mapes, Inc. ["Mapes"], under which Lunny leased and operated a Sunoco service station in North Berwick, Maine, at which petroleum and related products were sold to retail customers.

Lunny brought a ten-count complaint alleging various statutory and common law claims in the Superior Court for York County. The case has since been transferred to the Business and Consumer Court. Mapes filed a motion to dismiss the entire complaint under Rule 12(b)(6) of the Maine Rules of Civil Procedure. Lunny has filed a motion for leave to amend his complaint under M.R. Civ. P. 15(a), along with his proposed amended complaint. Mapes objects to the motion to amend on the ground that amendment would be futile. Oral argument on the motions was held August 17, 2011.

1

*Background*

Because the motion practice has been under Rules 12 and 15 of the Maine Rules of Civil Procedure rather than Rule 56, the background facts are largely undeveloped in the record, but what can be gleaned from the filings is as follows:

Lunny is a resident of Springvale and Mapes is a corporation engaged in the business of the wholesale distribution of motor fuels (also sometimes referred to as a "jobber") in the State of Maine. According to its motion to dismiss, Mapes bought petroleum products from the refiner producers and sold them to retail customers through the North Berwick service station leased to Lunny.

Exhibits A and B to Lunny's proposed amended complaint are what, for purposes of the present motions at least, he and Mapes acknowledge to be true copies of the two primary agreements underlying his claims and its defenses:

- The Management Fee Agreement between the parties, dated September 23, 2010, and by its terms effective for a three-year period beginning September 24, 2010, and

- The Lease Agreement between the parties, having the same date and duration.

Lunny's original and proposed amended complaints assert claims under the Maine Motor Fuel Distribution and Sales Act, 10 M.R.S. §§ 1451 *et seq.* and the Maine antitrust statute, 10 M.R.S. §§ 1101 *et seq.*, and various common law claims sounding in fraud, misrepresentation and unjust enrichment. In his proposed amended complaint, Lunny abandons the claims asserted in Counts II and IV of the original complaint.

Mapes's motion to dismiss asserts that all of the claims in the original complaint are insufficient as a matter of law. Mapes also opposes Lunny's motion to amend on the

2

ground that amendment would be futile, in that the proposed amended complaint fails to cure the shortcomings in the original complaint.

*Analysis*

A motion to dismiss "tests the legal sufficiency of the complaint." *Livonia v. Town of Rome*, 1998 ME 39, ¶ 5, 707 A.2d 83, 85. "Dismissal of a civil action is proper when the complaint fails 'to state a claim upon which relief can be granted.'" *Bean v. Cummings*, 2008 ME 18, ¶ 7, 939 A.2d 676, 679 (citing M.R. Civ. P. 12(b)(6)). In determining whether a motion to dismiss should be granted, the court considers "the allegations in the complaint in relation to any cause of action that may reasonably be inferred from the complaint." *Saunders v. Tisher*, 2006 ME 94, ¶ 8, 902 A.2d 830, 832.

The facts alleged are treated as admitted for purposes of the motion, and they are viewed "in the light most favorable to the plaintiff." *Id.* The court should dismiss a claim only "when it appears beyond a doubt that the plaintiff is not entitled to relief under any set of facts that he [or she] might prove in support of his [or her] claim." *Id.* (quoting *Johanson v. Dunnington*, 2001 ME 169, ¶ 5, 785 A.2d 1244, 1246).

As Mapes concedes in opposing Lunny's motion to amend, Lunny should be allowed to amend his complaint if the proposed amendment would cure what Mapes asserts are fatal deficiencies in the original complaint. Moreover, Lunny has abandoned two of his original claims. The court therefore focuses on the eight counts of Lunny's proposed amended complaint to determine whether they state claims upon which relief could be granted for purposes of Rule 12(b)(6).

Normally, when materials outside the pleadings are incorporated or referred to in a Rule 12(b)(6) motion, the court must decide whether to consider or exclude the additional materials, and if they are considered, the motion to dismiss is converted into a

3

motion for summary judgment. *See Beaucage v. City of Rockland,* 2000 ME 184, ¶ 5, 760 A.2d 1054, 1056; *In re Magro,* 655 A.2d 341, 342 (Me. 1995). *See also* M.R. Civ. P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment . . . .").

However, the Law Court has recognized an exception to this general rule covering three types of material outside the pleadings: "[O]fficial public documents, documents that are central to the plaintiff's claim, and documents referred to in the complaint [can be considered] without converting a motion to dismiss into a motion for a summary judgment when the authenticity of such documents is not challenged." *See Moody v. State Liquor and Lottery Commission,* 2004 ME 20, ¶ 10, 843 A.2d 43, 48.

Because the parties do not dispute the authenticity of the Management Fee Agreement and the Lease Agreement referred to in the proposed amended complaint, and because they are central to both parties' positions, the court considers them for purposes of Mapes's motion to dismiss, without converting the motion.

    1. Counts I, II, III and IV – Claims for Declaratory Judgment and Damages Regarding Alleged Violations of the Maine Motor Fuel Distribution and Sales Act, 10 M.R.S. §§ 1451 et seq.

Counts I, II, III and IV of the proposed amended complaint all are predicated on the premise that the Management Fee Agreement between Lunny and Mapes is partially or entirely unenforceable because it violates the Maine Motor Fuel Distribution and Sales Act, 10 M.R.S. §§ 1451 et seq. ["the Act"].

Count I seeks a declaratory judgment and an award of costs, including attorney fees. Count II seeks actual and punitive damages. Count III seeks damages in the form

4

of profits Lunny allegedly could or would have made but for the alleged violations of the Act. Count IV seeks damages measured in terms of unjust enrichment.

Lunny asserts that the Management Fee Agreement violates the Act in the following three ways:

- It expressly gives Mapes rather than Lunny the right to set the price at which gasoline is sold to retail customers from the service station.

- It lacks the specific notice regarding price-setting mandated by section 1454(1)(C) of the Act[1] to be included in any agreement that is subject to section 1454(1)

- It does not provide that the franchisee has the right to cancel within seven days.

As to the third alleged violation, for reasons set forth in more detail below the court is of the view that a franchise agreement does not have to contain an express provision permitting cancellation within 7 days. Were this the only basis for Counts I through IV, Mapes might be entitled to a dismissal of those counts.

However, the two other alleged violations require further analysis. Mapes's motion to dismiss Counts I through IV rests primarily on its position that section 1454(1)(C)—the subsection of the Act that is the basis for the claimed violations relating to price-setting and the notice regarding price-setting—does not apply to its relationship with Lunny.

Section 1454(1)(C) reads as follows:

C. The price at which a franchisee sells products shall not be fixed or maintained by a franchisor, nor shall any person seek to do so, nor shall the price of products be subject to enforcement or coercion by any person in any manner. Nothing herein shall be construed to prohibit a franchisor from suggesting prices and counseling with franchisees concerning prices. Each agreement shall have, in ten-point type, the legend: "PRICE FIXING OR MANDATORY PRICES FOR ANY PRODUCTS COVERED IN THIS AGREEMENT IS PROHIBITED. A SERVICE

---

[1] The proposed amended complaint actually refers to section 1454(1)(B) at this point, but this appears to be a typographical error because that subsection seems inapposite.

5

STATION DEALER OR WHOLESALE DISTRIBUTOR MAY SELL
ANY PRODUCTS LISTED IN THIS AGREEMENT FOR A PRICE
WHICH HE ALONE MAY DECIDE."

Mapes acknowledges that it is a "franchisor" and Lunny is or was a "franchisee,"
for purposes of the Act.[2]   The Law Court in *Webber Oil Company v. Murray*, held that
the Act in general applies to consignment arrangements such as that here.  551 A.2d
1371, 1373-74 (Me. 1988) (Hornby, J.).   However, as Mapes points out, the *Webber Oil*
decision does not address whether section 1454(1)(C) in particular applies to such
arrangements

Mapes argues that section 1454(1)(C) does not apply because Lunny "does not
sell motor fuel products at the [service station] Premises.   All sales of motor fuels at
the Premises are made by Mapes."   *Defendant H.A. Mapes, Inc.'s Motion to Dismiss with
Incorporated Memorandum of Law* at 6.

In support of that proposition, Mapes notes that the Management Fee
Agreement provides for "the consignment and distribution" of Mapes's petroleum
products, that Lunny as a consignee never takes title to the products and "has nothing
to sell." *Id.* at 7.  Mapes also argues that permitting Lunny to set the sales prices of

---

[2]  The Act defines "franchise agreement" to include:
> any written or oral agreement, for a definite or indefinite period, between a refiner and a
> retail dealer or between a distributor and a retail dealer or between a refiner and a
> distributor under which:
>> A. A retail dealer or a distributor promises to sell or distribute the product or
>> products of the refiner; or
>> B. A retail dealer or a distributor is granted the right to use a trademark, trade
>> name, service mark or other identifying symbol or name owned by a refiner; or
>> C. A retail dealer or a distributor is granted the right to occupy premises
>> owned, leased or controlled by a refiner or distributor.   ·

10 M.R.S. § 1453(4).

The agreement between Mapes and Lunny clearly qualifies at least under subsection C,
in that Lunny  was granted the right to occupy premises owned by Mapes.

6

products he does not own would lead to an "absurd result," because he could set prices below Mapes's cost. Thus, Mapes says that section 1454(1)(C) applies only to franchise relationships in which the dealer purchases products from the franchisor and resells them at retail, and does not apply to consignment arrangements such as that involved here. *Id.* at 7-9.

Lunny responds by citing contrary interpretations of section 1454(1)(C) in two decisions of the United States District Court for the District of Maine. *See Whitney v. Getty Petroleum Corp.*, No. 92-249-P-H, 1993 U.S. Dist. LEXIS 11454 (D. Me. June 9, 1993) (Hornby, J.); *Berry v. C.N. Brown Co.*, No. 88-0281-P (D. Me. Aug. 4, 1989) (Cohen, Mag. J.). Both decisions conclude that consignment arrangements such as that here—an arrangement between a petroleum products distributor and a service station operator who sells products owned by the distributor to retail customers from a service station owned by the distributor and leased to the operator—are subject to the prohibition on price-setting by the distributor contained in section 1454(1)(C).

In its reply memorandum, Mapes does not attempt to distinguish either of the federal court decisions, but argues that they are incorrect. Mapes says that the conclusion in both decisions that section 1454(1) applies to consignment arrangements is based on the general applicability of the Act itself, without a close reading of the statutory language that Mapes says excludes such arrangements from the scope of section 1454(1)(C). Because the Law Court has not ruled on the applicability of section 1454(1)(C) to a consignment arrangement such as that, this court parses the statute, and reaches the same conclusion as Judge Hornby and Magistrate Judge Cohen.

The introductory paragraph of section 1454(1) makes it clear that it applies to "every franchise agreement" that meets the threshold requirement of involving at least

7

$30,000 in annual sales and 35% of "the retail dealer's gross sales."[3]   Under Mapes's interpretation, Lunny sells nothing, so section 1454(1) would be inapplicable in its entirety. In fact, by differentiating between sales under the franchise agreement and a retail dealer's own gross sales, this provision makes it clear that every retail dealer is considered to be making sales under any franchise agreement, regardless of who owns the products sold.

Furthermore, the operative sentence of section 1454(1)(C)—" The price at which a franchisee sells products shall not be fixed or maintained by a franchisor, nor shall any person seek to do so, nor shall the price of products be subject to enforcement or coercion by any person in any manner"—contains nothing that limits the applicability of the sentence to products owned by the franchisee.

In the absence of qualifying or limiting terms anywhere in section 1454(1) or in subsection 1454(1)(C), the court sees no reason to give the term "franchisee sells products" anything other than its ordinary meaning.

Moreover, the very language of the Management Fee Agreement adopts the same ordinary meaning:

- The Agreement says that the Manager "shall have entire charge and control of the sale of Seller's products" Management Fee Agreement p. 1, section 6.

- It says "All sales shall be for cash, provided however, *credit sales may be made by Manager*," *id.* p. 2, section 7 (emphasis added).

- It says the Manager will "promote diligently the sale of motor fuel" and "actively and personally participate in the management of the gasoline sales," *id.* p. 3, section 15.

---

[3]  Mapes has not made the argument that, even if Lunny is deemed to be selling products, Section 1454(1) is inapplicable because its agreement with Lunny does not "[cover] more than 35% of the retail dealer's gross sales and such gross sales are more than $30,000 annually . . ."

8

Obviously, the parties contemplated in the Management Agreement that Lunny would be "selling" Mapes's products to consumers. For all of these reasons, Mapes's argument that, when Lunny took money from retail customers who bought gasoline at the service station he operated, he was not really selling the gasoline because he did not own it is unpersuasive, albeit creative.

As to Mapes's argument that the application of section 1454(1)(C) to its arrangement with Lunny would produce an absurd result by allowing Lunny to sell products at pries below Mapes's cost, the premise is simply incorrect. Mapes could very easily eliminate any potential "absurdity" and control its ability to make a profit by requiring Lunny to pay Mapes a given amount per gallon or other item sold, regardless of what price Lunny chose to charge the retail customer.

It is thus the payment structure that Mapes chose to use in its arrangement with Lunny that creates the potential absurdity, not the application of the statute to that arrangement. Magistrate Judge Cohen made that very point in his *Berry* decision:

> This consequence flows not from any peculiar provision of the Act but rather from the way in which the defendant chose to structure its relationship with the plaintiff despite the fact that at the time the parties entered into their first contract in 1985 the Act had already been in effect almost ten years.

*Berry v. C.N. Brown Co., supra,* No. 88-0281-P, at 7 n.5 (D. Me. Aug. 4, 1989).

As of today, the Act has been in effect for thirty years and *Berry* and *Whitney* have been of record for twenty-two and eighteen years respectively. The fact that the Maine Legislature has done nothing in the intervening years to amend or clarify the scope of section 1454(1)(C) in response to those decisions speaks for itself.

For all of the above reasons, the court concludes as a matter of law that Section 1454(1)(C) of the Act applies to the consignment agreement between the parties.

9

It therefore follows that Counts I, II, III and IV of the proposed amended complaint state valid claims to the extent they allege that the Management Fee Agreement violates section 1454(1)(C) of the Act by giving Mapes rather than Lunny control over pricing of products sold under the Agreement and by omitting the 10-point type provision mandated by that subsection regarding the franchisee's right to set prices.

The third violation of the Act alleged by Lunny in those counts is that the Management Fee Agreement lacks a required provision regarding the franchisee's right to cancel. Section 1454(1) on its face states that the right to terminate within seven days is one of the non-waivable provisions that apply "whether or not they are expressly set forth." Thus, the Act seems to assume that the right to terminate within seven days may or may not be contained in the franchise agreement, meaning that its absence is not a violation. Moreover, Lunny does not allege that he ever tried to exercise the statutory right to cancel, much less that Mapes refused such an attempt, so paragraph 9(c) of the amended complaint is insufficient to be the basis for a claim.

2. Count V—Alleged Violation of 10 M.R.S. § 1101; Count VI—Violation of UCC Duty of Good Faith and Fair Dealing

Count V of the proposed amended complaint purports to state a claim under Maine's antitrust act, 10 M.R.S. §§ 1101 *et seq.* However, for the reasons stated in Mapes's objection to Lunny's motion to amend, Lunny does not allege injury as a competitor or purchaser and therefore lacks standing to pursue such a claim in this context. His claim under Count VI for breach of the Uniform Commercial Code (UCC) duty of good faith and fair dealing presupposes that the UCC applies. As Mapes's memorandum establishes, the Code does not apply to the contract, except for the benefit of third parties under Article 9. Those counts therefore will be dismissed.

10

3.  Count VII and VIII for Fraud and Misrepresentation

Counts VII and VIII allege that Mapes is liable to Lunny for misrepresenting the lawfulness of the parties' agreement and the gasoline sales potential of the station. Whether either count states a viable claim—especially one governing by the heightened standard of proof for fraud claims—is doubtful.  Whether either count can result in any award of damages not encompassed within Counts I through IV is also doubtful. However, because both counts are reasonably specific as to the alleged misrepresentations, and because the alleged misrepresentations could be taken as representations of existing fact as opposed to predictions or statements of opinion, Counts VII and VIII will not be dismissed on the present record, and can be addressed again in the context of summary judgment, if such a motion is made.

*Conclusion*

IT IS HEREBY ORDERED AS FOLLOWS:

(1)  Plaintiff's Motion to Amend is granted.

(2)  Defendant's Motion to Dismiss is hereby granted in part as follows and otherwise denied:  Counts V and VI of the Amended Complaint are dismissed.  Paragraph 9(c) of the Amended Complaint, as it relates to Counts I, II, III, IV, VII and VIII fails to state a claim.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated August 31, 2011

A. M. Horton
Justice, Business and Consumer Court

Entered on the Docket: 8 31. 2011
Copies sent via Mail __ Electronically

11