**AUTOMATIC COMFORT
CORPORATION**

v.

**D & R SERVICE, INC.**

**Civ. No. H–84–1069 (PCD).**

United States District Court,
D. Connecticut.

Feb. 14, 1986.

Eliot B. Gersten, Gersten & Gersten, Hartford, Conn., for plaintiff.

Richard W. Farrell, Farrell & Barr, Stamford, Conn., for defendant.

## MEMORANDUM OF DECISION RE CONNECTICUT FAIR CONDUCT IN FRANCHISING ACT

DORSEY, District Judge.

Defendant has answered and counterclaimed on the basis that the Connecticut Fair Conduct in Franchising Act ("CFCFA"), Conn.Gen.Stat. § 42–133j *et seq.*, vested it with rights as a franchisee and precludes termination as asserted by plaintiff.[1] Plaintiff insists that even under CFCFA there is no franchise and it has terminated the contract with defendant in accordance with its terms.

### A. *Preemption*

The first question presented is whether Connecticut's Act has been preempted. Two sovereigns can create chaos with conflicting regulatory schemes for the same transactions or relationships. Under the Supremacy Clause of the United States Constitution, any federal enactment takes precedence and preempts state statutes which pertain to the same subject. CFCFA manifests Connecticut's concern for the preservation of fair competition within the petroleum industry as a means

---

1. Plaintiff has sought a declaratory judgment that no franchise was created between it and defendant under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.* That claim has been sustained. If defendant is a franchisee under CFCFA, it would gain no rights by reason thereof under PMPA. Defendant's counterclaim, based on PMPA, was reject-

ed in the prior memorandum of decision. Thus, only the issue presented by defendant's counterclaim remains, its claim of the benefit of CFCFA, for which no independent federal jurisdiction is required. Rule 13(a), Fed.R.Civ.P.; *Moore v. New York Cotton Exchange*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926); Moore, *Federal Practice*, § 1315[1] at 13–99 *et seq.*

of protecting those engaged in the distribution and sale of gasoline and the consuming public's supply. Defendant claims that, if it is not a franchisee under PMPA, it can be a franchisee under CFCFA, which is not in conflict with PMPA.

When Congress legislates with the intention of occupying a field, when an actual conflict exists between state and federal laws, that field is preempted by federal laws. *Bellmore v. Mobil Oil Corp.*, 783 F.2d 300, 303–304 (2d Cir.1986); *Grocery Mfgrs. v. Gerace*, 755 F.2d 993, 999 (2d Cir.1985). *See Pacific Gas & Elec. v. State Enviromental Resources*, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). An actual conflict exists "when it is impossible to comply with both state and federal law," *Florida Lime Growers v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or if state law is an obstacle to the accomplishment of Congress' objectives. *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941); *see Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). Congress has stated its intent with respect to preemption in PMPA:

> [To] the extent that any provision of this subchapter applies to termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

15 U.S.C. § 2806(a). It has been found that there is no franchise between plaintiff and defendant under PMPA. As the state is only precluded from adopting, enforcing or continuing in effect any state law other than the same provision as is found in PMPA *to the extent PMPA applies*, it follows that where PMPA does not apply there is no preemption and the state is free to enact its own laws. As Congress has mandated a preclusion of other than the same provisions as are found in PMPA with respect to "the grounds for, procedures for or notice requirements of the termination or nonrenewal of petroleum franchises," *Bellmore v. Mobil* at 305, there would not appear to be any intention on the part of Congress to preclude the state from enacting its own regulatory scheme with respect to relationships to which the federal law does not apply. *Id.* at 303–305.

Plaintiff suggests that a broader definition of a franchise in state law and its concomitant embrace of relationships not subject to federal regulation would frustrate Congress' desire for a consistent definition of franchises within the petroleum marketing field. Congress did not manifest an intent to occupy the entire field of petroleum marketing. Plaintiff has not shown why state regulation of a broader scope of relationships within the field, beyond that regulated by PMPA, would frustrate congressional intent. There is no indication in the record that the state's regulatory scheme impairs the purpose or effectiveness of PMPA. That the state chooses to regulate relationships which are not franchises under PMPA, if such be the case, would merely complement the federal regulatory purpose and scheme. As such, state law, defining franchises more broadly, is not preempted any more than any other section of CFCFA which is not in conflict with PMPA nor specifically within the provisions of the PMPA preemption section, 15 U.S.C. § 2806(a). Such have been held not to be preempted by PMPA. *Bellmore v. Mobil; Lasko v. Consumers Petroleum of Connecticut, Inc.*, 547 F.Supp. 211, 216 (D.Conn.1981); *Ted's Tire Serv. v. Chevron U.S.A., Inc.*, 470 F.Supp. 163, 165 (D.Conn.1979); *Exxon Corp. v.*

*George Ass'n of Petroleum Retailers*, 484 F.Supp. 1008 (D.Ga.1979), *aff'd*, 644 F.2d 1030 (5th Cir.) *cert. denied*, 454 U.S. 932, 102 S.Ct. 430, 70 L.Ed.2d 239 (1981).

## B. *Applicability of CFCFA*

■ Defendant claims that its contracts with plaintiff constitute a franchise under CFCFA which specifies these elements:

(a) An agreement or arrangement.

(b) The granting to the franchisee of the right to engage in the business of:
(1) offering
(2) selling
(3) distributing
motor vehicle fuels and oils.

(c) A marketing plan prescribed substantially by franchiser.

(d) The business must be substantially associated with the franchiser's trademark, service mark, trade name, logo type, advertising or other commercial symbol describing the franchiser or its affiliate.

(e) Included are agreements:
(1) between a manufacturer, refiner or producer and a distributor, wholesaler or jobber.
(2) between a manufacturer, refiner or producer and a retailer.
(3) between a distributor, wholesaler or jobber and a retailer.

Conn.Gen.Stat. § 42–133k(b). A franchiser is one who grants a franchise to another, including a manufacturer, refiner or producer or a distributor, wholesaler or jobber, who grants to a distributor, wholesaler, jobber or retailer the authority to use *a* trademark, trade name, service mark or other identification symbol or name under a franchise. Conn.Gen.Stat. § 42–133k(a), incorporating § 42–133e(b). A franchisee is the counterpart, one granted authority under a franchise, to use *a* trademark, trade name, service mark, or other identification symbol or name, including a distributor, wholesaler or jobber or retailer. *Id.*

Clearly an agreement exists between the parties.

The agreements:

(a) Vested defendant with the right to operate and manage two stations at which gasoline is sold, subject to extensive, detailed control by plaintiff over the manner in which the business was conducted, including the sale price.

(b) Entitled defendant to a commission in fixed amounts per unit for sales of gasoline, anti-freeze and cigarettes as well as other products supplied by plaintiff.

(c) Obliged plaintiff to supply gasoline, anti-freeze and cigarettes.

(d) Required the sale of a brand of gasoline supplied by plaintiff to each station.

(e) Permitted defendant to sell associated products as plaintiff permitted.

(f) Obliged defendant to collect cash and process credit cards for plaintiff's account, deducting from the cash its commissions and depositing the net in plaintiff's bank account.

(g) Obliged defendant to account to plaintiff for gasoline delivered to each station.

(h) Obliged defendant to maintain the equipment except as to ordinary wear and tear.

(i) Obliged defendant to keep the property clean and well lighted, protected by a security alarm, and clear of snow and ice.

(j) Obliged defendant to specific minimum hours of operation.

(k) Obliged defendant to hire necessary employees and to discharge all legal obligations to employees.

(*l*) Obliged defendant to submit to inspections and audits by plaintiff to verify compliance.

Thus defendant, as the contract provides, has the posture of "managing the gasoline dispensing operation" of plaintiff. *See* Exhibits 1 & 2 at 3. Certainly defendant is engaged in a business as a result of the contract. It hires employees who engage in activities from which income is derived; it pays its employees and operating expenses from its commissions and keeps the net for its own purposes. It may seek to

do what additional business may be permitted at each station. It is at risk in that its commissions, which depend upon the volume of gasoline sold, may not cover its expenses. Yet, it has no control over the volume of gasoline sold. Sales volume depends principally on such things as brand popularity, station location, station hours, station security and perhaps most importantly, the price which plaintiff sets.

Notwithstanding its business function, the question is whether defendant has been granted the right to engage in the business of offering or selling [2] motor fuels and oils. Plaintiff argues in the negative because defendant neither purchases gasoline or oil nor does it convey title to the ultimate consumer. Rather, defendant merely receives the sale price and accounts for it. The question can best be analyzed by measuring how far defendant is from the situation of a pure employee, who merely takes money and hands it over to his employer. To be a franchise, the franchisee must be engaged in the business of offering or selling gasoline. In actuality it is the plaintiff who is offering/selling gasoline to the public. It owns the station. It buys the gasoline. It arranges for the acquisition of the gasoline and delivers it to the stations. It sets the prices. It is at risk for any loss of the gasoline at the station except by reason of fault on the part of defendant. As discussed in the prior memorandum of decision, defendant was not at any substantial market risk, nor did it have any substantial indicia of entrepreneurial responsibility. Defendant was not engaged in the business of offering or selling gasoline. It was the temporary custodian of the gasoline, the caretaker of the property, the cashier, all as part of plaintiff's business. Plaintiff's argument that the question turns on the absence of any purchases by defendant and of sales in the sense of conveying title is too narrow. Defendant's rights and responsibilities are very close to the sale process, but the statutory phrase—engaged in the business of offer-

ing/selling—is not so narrow, reflective of the state's intention to extend more broadly the protection of the statutory scheme. However, the narrow scope of the discretion exercisable by defendant, the close control and supervision exercisable by plaintiff over the operation, so limits defendant's activities as to preclude its being found to be engaged in the business of offering/selling gasoline and oil products at retail. Defendant was not a licensed retailer—plaintiff was. Defendant was not an employee. By the contract terms, it was an independent business entity. But the range of what defendant does in that capacity is markedly limited. Defendant performs an extremely restricted role as part of the business of offering/selling gasoline at retail.

It is well to measure defendant's posture against the purpose of the Connecticut Legislature. The statutory definition of a franchise is not absolutely clear. The Legislature has created, however, a limited status to which protection is afforded. The Legislature has articulated its concerns and purposes. See Conn.Gen.Stat. § 42–133j. A finding that defendant is not within the CFCPA's protection does not run counter to any of the concerns and purposes set forth in the statute. While plaintiff has tendered defendant an arrangement which vested very little autonomy in defendant and thus has flexed its substantially greater bargaining power, it has not adversely affected the flow of gasoline to a competitive market place. It will continue to sell its gasoline at the same locations, but presumably with someone other than defendant collecting the payments. While defendant's hopes, and perhaps expectations, of a share in the profit from sales to the public is not upheld here, one with a substantial investment in the business is thus not being squeezed out. To be sure, defendant probably has invested considerable time in the operation, but it was paid for that in the form of its commissions. That its prof-

---

**2.** Defendant is plainly not a distributor, having none of the characteristics thereof.

it may not have been what was hoped for could be the result of an optimistic calculation. It may also be due to other factors beyond defendant's control. Nonetheless, it was a bargain defendant made and cannot expect the court to reform unilaterally. There is no showing that any uniqueness at either station resulted from defendant's innovation or effort. The patronage, absent evidence to the contrary, would appear to have been based on product identification, location, lighting, price and other factors not innovative with defendant. Though no doubt a courteous cashier, a helpful attendant, extra service to customers, super cleanliness or other marks of an operator's input, though not shown here, might play some role in the volume sold, the significance of any such innovation on the part of defendant is not part of this record. The court cannot speculate in these matters. Thus, Connecticut's wish to protect the investment of time and money, which generate good will for operators whose personal touch was manifest, does not embrace defendant's operations which have not been shown to have been conducive to such value creation. Thus, the court cannot find that the nature of defendant's operation is such as to be within the language of the CFCFA as it may be construed to accomplish the purposes of CFCFA.

While defendant was clearly operating within a marketing plan dictated by plaintiff and cannot waive its rights as a franchisee, Conn.Gen.Stat. § 42–133f(e), the parties' contract did not frame a relationship which Connecticut has defined as a franchise. Therefore, defendant may not prevail on its claim for the benefit of CFCFA as a franchisee thereunder.

As this resolves all issues submitted by the parties at trial, in their stipulations and briefs, judgment shall enter for plaintiff on defendant's counterclaim under PMPA and CFCFA and for plaintiff on the complaint as previously set forth in the memorandum of decision of October 28, 1985.

SO ORDERED.