******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# BRANFORD QUICK MART, LLC, ET AL. *v.* ALDIN ASSOCIATES LIMITED PARTNERSHIP
## (AC 47519)

Alvord, Moll and Pellegrino, Js.

### *Syllabus*

The plaintiff service station owners appealed from the trial court's judgment for the defendant in their action alleging, inter alia, that the defendant's termination of certain lease agreements was in violation of the Connecticut Petroleum Franchise Act (§ 42-133j et seq.). The plaintiffs claimed that the court improperly rendered judgment for the defendant because the protections of the petroleum franchise act applied to the contractual relationships between the parties. *Held*:

The trial court properly rendered judgment for the defendant on the plaintiffs' claims, as the plaintiffs were not "retailers" within the meaning of the petroleum franchise act and, therefore, there was no franchise relationship entitling them to protection under that act.

**(*One judge dissenting*)**

Argued September 16, 2025—officially released January 27, 2026

### *Procedural History*

Action, inter alia, seeking a judgment declaring that the defendant's termination of certain lease agreements violated the Connecticut Petroleum Franchise Act, and for other relief, brought to the Superior Court in the judicial district of New Haven and tried to the court, *Hon. Jon C. Blue*, judge trial referee; judgment for the defendant, from which the plaintiffs appealed to this court. *Affirmed*.

*John J. Morgan*, for the appellants (plaintiffs).

*Theodore W. Heiser*, for the appellee (defendant).

### *Opinion*

ALVORD, J. The plaintiffs, Branford Quick Mart, LLC, Seaport Quick Mart, LLC, and Dayville Quick Mart, LLC,[1] appeal from the judgment of the trial court

---

[1] When appropriate, Branford Quick Mart, LLC, Seaport Quick Mart, LLC, and Dayville Quick Mart, LLC, collectively will be referred to as the plaintiffs.

rendered in favor of the defendant, Aldin Associates Limited Partnership, in this action alleging that the defendant's termination of lease agreements was in violation of the Connecticut Petroleum Franchise Act (petroleum franchise act), General Statutes §42-133j et seq. On appeal, the plaintiffs claim that the court improperly rendered judgment for the defendant because the protections of the petroleum franchise act apply to the contractual relationships between the parties.[2] We affirm the judgment of the trial court.

The following stipulated facts, as recited by the trial court, and procedural history are relevant to our resolution of this appeal. "There are three plaintiffs. Branford Quick Mart, LLC, operates a business in Branford. Seaport Quick Mart, LLC, operates a business in Mystic. Dayville Quick Mart, LLC, operates a business in Dayville. . . . Each [plaintiff] operates a convenience store and gas station. The sole defendant . . . leases convenience stores (not the surrounding properties) to the plaintiffs. In addition, [the defendant] provides motor fuels which 'are sold to the retail public.' . . .

"Pursuant to contractual provisions, [the plaintiffs sell] 'motor gasoline and other petroleum products "for the account of" ' [the defendant]. [The defendant] arranges deliveries of motor fuels to each location. The fuels are then sold to retail customers under a trademark owned or controlled by a refiner of motor fuels. . . . [The plaintiffs have] 'no involvement in the purchase, negotiation, transport, or otherwise with respect to the petroleum products delivered to the station.' [The plaintiffs do] not pay for motor fuel equipment. [The defendant] owns the underground storage tanks and is responsible for their cleanup and repair. If a petroleum

---

[2] Although the plaintiffs identify four issues in the statement of issues in their principal appellate brief, the issues are closely related and, accordingly, we consider them together.

product is lost in transit, [the defendant] remains at risk for the loss. . . .

"A 'Commissioned Agent Agreement' between the parties further clarifies the question of ownership of the motor fuels sold at the service stations. 'All such motor fuels shall be and remain the property of [the defendant] until sold to retail customers, and the proceeds therefrom shall be and remain the sole property of [the defendant] and shall be held in trust by [the plaintiffs] for the benefit and account of [the defendant] and shall be accounted for by [the plaintiffs].' [The defendant] 'shall have sole responsibility to establish the retail prices at its discretion for motor fuels sold at the Service Station, and [the plaintiffs] shall sell motor fuels at the retail prices so established by [the defendant], and shall change retail prices upon notice from [the defendant] . . . .'

"The leases in question differ slightly as to dates, but the precise dates and other details are unimportant. The Convenience Store Lease between [the defendant] and Branford Quick Mart [LLC] . . . is representative. The lease was executed by the parties on February 21, 2012. By its terms, it ended on the tenth anniversary of that document unless previously terminated. [The defendant] further had the right to terminate the lease without liability to [Branford] Quick Mart [LLC] by providing 120 days written notice of termination to [Branford] Quick Mart [LLC]. . . .

"In September and October, [2021, the defendant] delivered appropriate notices of termination to each plaintiff. . . .

"This action was commenced by service of process on February 14, 2022. . . . The complaint consists of two counts. Count one alleges a violation of the [petroleum franchise act]. Count two alleges a violation of the Connecticut Unfair Trade Practices Act . . . General Statutes §42-110b et seq. In addition to seeking damages, the complaint seeks a declaratory judgment that the termination of lease notices violate [the petroleum franchise act] and

an injunction barring [the defendant] from terminating the leases in question without further order of the court.

"The case was scheduled for a trial to the court on January 26, 2024. Counsel for the parties appeared on that date and agreed on the record that, in lieu of calling witnesses, they would agree to (1) bifurcate the issue of damages from the issues of declaratory and injunctive relief . . . and (2) present the case with respect to declaratory and injunctive relief by way of a stipulation of facts. The proposed stipulation . . . was filed on February [6], 2024. Following poststipulation briefing, the case was argued on March 11, 2024." (Citations omitted.)

On March 14, 2024, the trial court, *Hon. Jon C. Blue,* judge trial referee, rendered judgment in favor of the defendant, finding that the relationship between the parties did not constitute franchises for purposes of protection under the petroleum franchise act. The court examined the language of the petroleum franchise act, the related federal law, and cases interpreting both. The plaintiffs filed a motion for reconsideration, which was denied. This appeal followed.

Because our review of the trial court's legal determination turns on a question of statutory interpretation, we exercise plenary review. See *Civic Mind, LLC* v. *Hartford*, 229 Conn. App. 615, 637, 328 A.3d 225 (2024), cert. denied, 351 Conn. 919, 333 A.3d 103 (2025). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . It is a basic tenet of statutory construction that [w]e construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation." (Internal

quotation marks omitted.) Id., 637–38. "When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same general subject matter . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Gonzalez* v. *O & G Industries, Inc.*, 322 Conn. 291, 302–303, 140 A.3d 950 (2016).

We begin our analysis with the language of General Statutes § 42-133*l* (a), which provides in relevant part that "[n]o franchisor shall . . . terminate, cancel or fail to renew a franchise, except for good cause shown . . . ." In the present case, the defendant does not argue that it had good cause to issue notices of termination to the plaintiffs; rather, it argues that the notices did not terminate franchises within the meaning of § 42-133*l* (a). Whether the notices terminated franchises under the statute turns on whether the plaintiffs are "retailers." See General Statutes § 42-133k (defining " '[f]ranchise' " as "any contract (A) between a refiner and a distributor; (B) between a refiner and a retailer; (C) between a distributor and another distributor; or (D) between a distributor and a retailer, under which a refiner or distributor, as the case may be, authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use"). The plaintiffs contend that they are retailers within the meaning of § 42-133k, which does not separately define that term. We construe the statute to be ambiguous in this regard. See *Dunn* v. *Northeast Helicopters Flight Services, LLC*, 346 Conn. 360, 378, 290 A.3d 780 (2023); see also *Lopez* v. *William Raveis Real Estate, Inc.*, 343 Conn. 31, 42, 272 A.3d 150 (2022) ("When silence renders a statutory provision ambiguous

with respect to [the issue at hand], our analysis is not limited by . . . § 1-2z . . . . In addition to the words of the statute itself, we look to . . . the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same general subject matter." (Internal quotation marks omitted.)).

It is necessary, therefore, to review the history of the statute, case law addressing it, and analogous federal law. In 1977, Connecticut enacted the petroleum franchise act. Public Acts 1977, No. 77-493, § 1. The legislative findings state: "The legislature of the state of Connecticut finds and declares that the distribution and sales of gasoline and petroleum products through franchises within the state of Connecticut, including the rights and obligations of suppliers and dealers, vitally affects its general economy. In order to promote the public interest and public welfare, to avoid undue control of the dealer by suppliers, to foster and keep alive vigorous and healthy competition for the benefit of the public by prohibiting practices through which fair and honest competition is destroyed or prevented, to promote the public safety, to prevent deterioration of facilities for servicing motor vehicles on the highways of the state, to prevent dealers from unnecessarily going out of business thereby resulting in unemployment with loss of tax revenue to the state and its resultant undesirable consequences, and to offset evident abuses within the petroleum industry as a result of inequitable economic power, it is necessary to legislate standards pursuant to the exercise of the police power of this state governing the relationship between suppliers and distributors of gasoline and petroleum products and the dealers within the state who sell those products to the public." General Statutes § 42-133j (a).

The petroleum franchise act, as originally enacted in 1977, incorporated language from the Connecticut Franchise Act (general franchise act), General Statutes §§ 42-133e through 42-133h, in defining franchise as "an

oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing motor vehicle fuels and oils and other related products and offering or selling services associated with such products and with gasoline service stations under a marketing plan or system . . . and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark . . . ." General Statutes (Rev. to 1979) § 42-133k (b).

In 1978, Congress enacted the federal Petroleum Marketing Practices Act (PMPA), Pub. L. No. 95-297, 92 Stat. 322 (1978), codified at 15 U.S.C. § 2801 et seq., which governs the termination of franchise relationships with respect to the sale of motor fuel. "The PMPA was passed to alleviate concern that franchise dealers could be subjected to unfair treatment by the supplier of their principal sales item, motor fuel. Specifically, it was designed to protect against the arbitrary or discriminatory termination or nonrenewal of a motor fuel franchise." *Farm Stores, Inc.* v. *Texaco, Inc.*, 763 F.2d 1335, 1339 (11th Cir.), cert. dismissed, 474 U.S. 1039, 106 S. Ct. 609, 88 L. Ed. 2d 586 (1985). "The PMPA, therefore, was drafted so as to prohibit the termination or nonrenewal of a franchise unless that termination or nonrenewal is based on one of the permissible reasons set forth in [15 U.S.C.] § 2802 and given in compliance with the procedural notice requirements set forth in [15 U.S.C.] § 2804." Id. "Congress intended the PMPA to apply only to the franchise relationship between a 'refiner,' 'distributor,' or 'retailer' of motor fuels under a brand name"; id., 1339–40; and the PMPA defines each of those terms. "Unless the parties meet the statutory definition of one of those terms, there is no coverage under the PMPA and general contractual principles govern." Id., 1340.

In 1986, the United States District Court for the District of Connecticut was presented with the question of whether, under the terms of the petroleum franchise

act, a defendant service station operator was engaged in the business of offering or selling motor gasoline such that it fell within the meaning of the term "franchisee." *Automatic Comfort Corp.* v. *D & R Service, Inc.*, 627 F. Supp. 783, 786–87 (D. Conn. 1986) (*Automatic Comfort*). The court rendered judgment for the plaintiff on the defendant's counterclaim under the petroleum franchise act on the basis that the contract between the defendant and the plaintiff was not a franchise.[3] Id., 787. The court reasoned: "The question can best be analyzed by measuring how far [the] defendant is from the situation of a pure employee, who merely takes money and hands it over to his employer. To be a franchise, the franchisee must be engaged in the business of offering or selling gasoline. In actuality it is the plaintiff who is offering/selling gasoline to the public. It owns the station. It buys the gasoline. It arranges for the acquisition of the gasoline and delivers

[3] The agreement:

"(a) Vested defendant with the right to operate and manage two stations at which gasoline is sold, subject to extensive, detailed control by plaintiff over the manner in which the business was conducted, including the sale price.

"(b) Entitled defendant to a commission in fixed amounts per unit for sales of gasoline, anti-freeze and cigarettes as well as other products supplied by plaintiff.

"(c) Obliged plaintiff to supply gasoline, anti-freeze and cigarettes.

"(d) Required the sale of a brand of gasoline supplied by plaintiff to each station.

"(e) Permitted defendant to sell associated products as plaintiff permitted.

"(f) Obliged defendant to collect cash and process credit cards for plaintiff's account, deducting from the cash its commissions and depositing the net in plaintiff's bank account.

"(g) Obliged defendant to account to plaintiff for gasoline delivered to each station.

"(h) Obliged defendant to maintain the equipment except as to ordinary wear and tear.

"(i) Obliged defendant to keep the property clean and well lighted, protected by a security alarm, and clear of snow and ice.

"(j) Obliged defendant to specific minimum hours of operation.

"(k) Obliged defendant to hire necessary employees and to discharge all legal obligations to employees.

"(*l*) Obliged defendant to submit to inspections and audits by plaintiff to verify compliance." *Automatic Comfort Corp*. v. *D & R Service*, *Inc.*, supra, 627 F. Supp. 785.

it to the stations. It sets the prices. It is at risk for any loss of the gasoline at the station except by reason of fault on the part of [the] defendant. As discussed in the prior memorandum of decision, [the] defendant was not at any substantial market risk, nor did it have any substantial indicia of entrepreneurial responsibility. [The] defendant was not engaged in the business of offering or selling gasoline. It was the temporary custodian of the gasoline, the caretaker of the property, the cashier, all as part of [the] plaintiff's business." Id., 786.

The court in *Automatic Comfort* rejected the plaintiff's contention that the fact that the defendant did not take title to the gas was dispositive, reasoning that the "[d]efendant's rights and responsibilities are very close to the sale process, but the statutory phrase—engaged in the business of offering/selling—is not so narrow, reflective of the state's intention to extend more broadly the protection of the statutory scheme. However, the narrow scope of the discretion exercisable by [the] defendant, the close control and supervision exercisable by [the] plaintiff over the operation, so limits [the] defendant's activities as to preclude its being found to be engaged in the business of offering/selling gasoline and oil products at retail. [The] defendant was not a licensed retailer— [the] plaintiff was. [The] defendant was not an employee. By the contract terms, it was an independent business entity. But the range of what [the] defendant does in that capacity is markedly limited. [The] defendant performs an extremely restricted role as part of the business of offering/selling gasoline at retail." Id.

Finally, the court in *Automatic Comfort* examined the purpose of the petroleum franchise act, noting that the "statutory definition of a franchise is not absolutely clear." Id. Citing the legislative findings and purpose

contained in §42-133j, the court stated that "[a] finding that [the] defendant is not within the [petroleum franchise act's] protection does not run counter to any of the concerns and purposes set forth in the statute. While [the] plaintiff has tendered [the] defendant an arrangement which vested very little autonomy in [the] defendant and thus has flexed its substantially greater bargaining power, it has not adversely affected the flow of gasoline to a competitive market place. It will continue to sell its gasoline at the same locations, but presumably with someone other than [the] defendant collecting the payments. While [the] defendant's hopes, and perhaps expectations, of a share in the profit from sales to the public is not upheld here, one with a substantial investment in the business is thus not being squeezed out. To be sure, [the] defendant probably has invested considerable time in the operation, but it was paid for that in the form of its commissions. That its profit may not have been what was hoped for could be the result of an optimistic calculation. It may also be due to other factors beyond [the] defendant's control. Nonetheless, it was a bargain [the] defendant made and cannot expect the court to reform unilaterally. There is no showing that any uniqueness at either station resulted from [the] defendant's innovation or effort. The patronage, absent evidence to the contrary, would appear to have been based on product identification, location, lighting, price and other factors not innovative with [the] defendant. Though no doubt a courteous cashier, a helpful attendant, extra service to customers, super cleanliness or other marks of an operator's input, though not shown here, might play some role in the volume sold, the significance of any such innovation on the part of [the] defendant is not part of this record. The court cannot speculate in these matters. Thus, Connecticut's wish to protect the investment of time and money, which generate good will

for operators whose personal touch was manifest, does not embrace [the] defendant's operations which have not been shown to have been conducive to such value creation. Thus, the court cannot find that the nature of [the] defendant's operation is such as to be within the language of the [petroleum franchise act] as it may be construed to accomplish the purposes of [that act]." Id., 786–87. Accordingly, the court concluded that "the parties' contract did not frame a relationship which Connecticut has defined as a franchise."[4] Id., 787.

[4] Our Supreme Court in *Getty Petroleum Marketing, Inc.* v. *Ahmad*, 253 Conn. 806, 757 A.2d 494 (2000), considered whether certain written agreements created franchises within the meaning of General Statutes § 42-133f (a) of the general franchise act. Although it was "not disputed that the agreements do not establish franchises that are subject to the provisions of the petroleum franchise act"; id., 810 n.4; we nevertheless find the court's discussion relevant.

Our Supreme Court reversed the judgment of the trial court, which had determined that "franchises existed between the parties that were subject to the general franchise act, which requires that a franchisee 'engage in the business of offering, selling or distributing goods or services under a marketing plan or system . . . .' General Statutes § 42-133e (b)." *Getty Petroleum Marketing, Inc.* v. *Ahmad*, supra, 253 Conn. 812. The court considered that the agreements' terms provided that the plaintiff would deliver and set the price for the gasoline, the plaintiff retained ownership of the gasoline following delivery until the gasoline was sold to the plaintiff's customers, the plaintiff owned all income and accounts receivable arising out of the sale of the gasoline, the defendants were identified as commissioned agents and were paid a commission for each gallon of gasoline sold through the plaintiff's marketing equipment, the defendants were required to deposit proceeds of the sales promptly into the plaintiff's drop safes, and the defendants operated independent convenience stores at the locations leased from the plaintiff. Id., 813–14. On the basis of these terms, the court determined that "the defendants did not bear the burden of marketplace risk that is indicative of an independent business operator." Id., 818.

Accordingly, our Supreme Court concluded: "Because the plaintiff was selling its own gasoline, with the defendants acting as commission agents to facilitate the exchange, we conclude that there was insufficient evidence to establish that the defendants had any entrepreneurial responsibility as to the sale of gasoline or the gasoline itself. While it may be that the defendants assumed entrepreneurial responsibility for the convenience stores that they operated at the premises, the only goods sold under the plaintiff's trademark were the plaintiff's gasoline, motor oil and other promotional items. . . . The defendants were functioning as service station managers responsible for seeing that the gasoline was

In 1991, the Connecticut legislature amended the petroleum franchise act.[5] Public Acts 1991, No. 91-195. During the General Law Committee meeting held on March 19, 1991, then Attorney General Richard Blumenthal testified that "[c]ertain franchises presently are not covered by the act that provides protections to franchisees, and this bill will provide greater [clarity] in the law and therefore greater protection by expanding the definition of franchise, franchisor and franchisee in the Connecticut law to include types of relationships. Particularly one that came to my attention involving gasoline station franchisee, that currently are not covered in the law." Conn. Joint Standing Committee Hearings, General Law, Pt. 4, 1991 Sess., p. 921.

Other individuals testified before the General Law Committee, including A.J. Barr, an attorney representing the Connecticut Gasoline Retailers Association. See Conn. Joint Standing Committee Hearings, supra, p. 948. Barr testified: "It may seem hard to believe, but we have

sold and that payments were collected and forwarded to the plaintiff. Because the defendants did not own the gasoline or assume any substantial market risk in its sale, we conclude that they were not retailers in the business of selling gasoline as independent business operators. They were rather, as the court in *Automatic Comfort Corp.* v. *D & R Service, Inc.*, supra, 627 F. Supp. 786, stated, the 'temporary custodian[s] of the gasoline, the caretaker[s] of the property, the cashier[s], all as part of [the] plaintiff's business.' Because the defendants were not engaged in the business of offering, selling or distributing the gasoline, they were not franchisees under the general franchise act." (Citation omitted.) *Getty Petroleum Marketing, Inc.* v. *Ahmad*, supra, 253 Conn. 818–19.

Finally, our Supreme Court noted that its determination was consistent with the purpose of the general franchise act, which it described as protecting "independent business persons who have assumed an entrepreneurial role and who face the risk of the market." Id., 819. To conclude otherwise would be to "blur the distinction between the entrepreneur and one who acts as an agent for another in selling a product." Id., 820. Accordingly, the court found that the defendants were not afforded protection pursuant to the general franchise act. Id.

[5] The plaintiffs argue that the trial court improperly relied on *Automatic Comfort*, maintaining that it was legislatively overruled by the 1991 amendment. Although *Automatic Comfort* addressed the pre-1991 version of the petroleum franchise act, its analysis of the parties' relationship continues to provide guidance.

had federal district judges in this state, say, oh, Shell stations, ARCO, Gulf, those aren't franchises under our franchise definition. They've said that the typical service station sitting on your corner is not a petroleum product franchise. I guess my question has been to them, what is a petroleum product franchise? A Dairy Queen? I mean, if service stations aren't petroleum product franchises apparently they don't exist. The problem is that the courts have said, well, in our definition section, we speak of marketing plan. And that the oil companies don't dictate a marketing plan. We feel they're wrong. But that's between us and the courts. What we have said is, look let's cut through this, let's get down to protecting the franchises. This Act, [§§ 42-133j through 42-133n], talks about no one but service stations, so we can't confuse it with someone else. I believe the easiest way to remedy the problem is simply to say, as was said in Proposed SB385, definition of franchisee, franchiser and franchise, is that as contained in [the PMPA]. . . .

"All we're saying is we're getting hung up on definitions. We all know it's a service station. You look at a Shell station, you're going to tell me that's not a service station? The courts have gotten hung up on the definition. They have recognized the oil companies have not argued that these are franchises under the federal franchise act, they have just said you're not a franchise under the state franchise act, thus you have no state franchise protection. So, I'm saying make it very easy. Simply say, we incorporate the definition that's in the federal franchise [act], the [PMPA]." Conn. Joint Standing Committee Hearings, supra, pp. 948–49.

Barr continued: "[I]n order to make the statute cover service stations, which is what it was passed to cover, we would delete lines 91, starting with 'a franchise is granted.' We would delete [lines] 91 through 110, which ends by saying 'retailer.' From [lines] 110 to 133, is exactly the language in the federal [PMPA]. That is what we wish the state to adopt as our definition. It seems almost incomprehensible to believe that we're a

service station franchise under federal law, but we're not a service station franchise under state law. I think the expression is a rose is a rose is a rose, no matter what you call it." Conn. Joint Standing Committee Hearings, supra, pp. 950–51.

The 1991 amendments to the petroleum franchise act adopted verbatim the PMPA's statutory definitions of franchise, franchisor, and franchisee. Thus, § 42-133k (1) defines a " '[f]ranchise' " as "any contract (A) between a refiner and a distributor; (B) between a refiner and a retailer; (C) between a distributor and another distributor; or (D) between a distributor and a retailer, under which a refiner or distributor, as the case may be, authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use." Further, § 42-133k (2) provides that a " '[f]ranchise' includes (A) any contract under which a retailer or distributor, as the case may be, is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy; (B) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed (i) under a trademark owned or controlled by a refiner; or (ii) under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner; and (iii) the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of state law which permits such

transfer or assignment without regard to any provision of the franchise."

A " '[f]ranchise relationship' " under § 42-133k (3) is defined as "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise." " 'Franchisor' means a refiner or distributor, as the case may be, who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel." General Statutes § 42-133k (4). Finally, a " '[f]ranchisee' " is defined as "a retailer or distributor, as the case may be, who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel." General Statutes § 42-133k (5).

The 1991 amendments to the petroleum franchise act did not separately define all terms that are separately defined within the PMPA. Retailer is one such term that was left undefined in the 1991 amendments. The PMPA defines retailer as "any person who purchases motor fuel for sale to the general public for ultimate consumption." 15 U.S.C. § 2801 (7) (2018). As stipulated, the plaintiffs do not have any involvement in the purchase of motor fuel and, thus, they do not satisfy the definition of retailer under the PMPA.

Federal courts have had occasion to address the definitional terms contained within the PMPA. In *Farm Stores, Inc.* v. *Texaco, Inc.*, supra, 763 F.2d 1335, the United States Court of Appeals for the Eleventh Circuit determined that a gas station operator was not a retailer within the meaning of the PMPA because it did not purchase motor fuel. Id., 1340. The court set forth the statutory language and explained: "Congress intended the PMPA to apply only to the franchise relationship between a 'refiner,' 'distributor,' or 'retailer' of motor fuels under a brand name. Unless the parties meet the statutory definition of one of these terms, there is no coverage under the PMPA and general contractual principles

govern." Id., 1339–40. In analyzing whether the gas station operator was a retailer, the court considered that the operator did not "(i) pay for the gasoline inventory until it was sold; (ii) take title; (iii) pay ad valorem taxes on the gasoline inventory; (iv) bear the risk of loss of the gasoline (except for its own carelessness); (v) retain any funds from the sale of the gasoline to motorists; (vi) set the price or assume the market risk in fluctuations in gasoline prices; (vii) pay sales taxes or extend credit to motorists on resale; and (viii) hold a gasoline retailers business license."[6] Id., 1340.

With this legislative and case law history in mind, we now turn to the plaintiffs' first contention that the Connecticut legislature, in adopting four definitions from the PMPA, rejected the remaining definitional sections. They contend that the omission of the definitional sections means that "a different intention existed." We note that the legislature in 1991 included five definition provisions, two of which addressed the term " '[f]ranchise,' " and the remaining three define " '[f]ranchise relationship,' " " '[f]ranchisor,' " and " '[f]ranchisee.' " General Statutes § 42-133k (1) through (5). Those five definition provisions are substantively the same as the first four definition provisions under the PMPA. See 15 U.S.C. § 2801 (1) through (4) (2018). The PMPA, however, goes on to include fifteen additional definition sections, many of which define terms also found in the petroleum franchise act. This includes "refiner," "distributor," "marketing premises," "leased marketing premises," "contract," "trademark," "motor fuel," "failure," "fail to renew," and "affiliate." See 15 U.S.C. § 2801 (5), (6), (8), and (9) through (15) (2018). We are

---

[6] The plaintiffs argue that the trial court in the present case improperly relied on *Farm Stores, Inc.* v. *Texaco, Inc.*, supra, 763 F.2d 1335, on the basis that "the sole proposition for which [that case] stands is that *hourly employees* cannot be construed as 'constructive retailers' or 'constructive distributors' where they were not protected under any statutory regime." (Emphasis in original.) Although the contractual arrangement at issue in that case was distinct from the present case in that it required the defendant to pay the operator a fixed hourly rate for operating the station regardless of whether any gasoline was sold, we nevertheless find the analysis relevant.

not persuaded that the legislature's failure to define separately each of these terms, as Congress did in enacting the PMPA, requires us to conclude that the legislature intended different meanings for each of these terms. This is especially true in light of the fact that the terms "retailer" and "distributor" are used identically in the state and federal definitions of "franchise." See General Statutes § 42-133k (1) and (2); 15 U.S.C. § 2801 (1). Under these circumstances, we cannot conclude that the absence of separate definitions necessitates the conclusion that the legislature intended these terms to have different definitions from the PMPA.[7]

The defendant responds that, because the term "retailer" is undefined in the petroleum franchise act, the trial court correctly looked to the dictionary definition of that term. At the time of the statute's amendment, Black's Law Dictionary defined "[r]etailer" as "[a] person engaged in making sales to ultimate consumers. One who sells personal or household goods for use or consumption." Black's Law Dictionary (6th Ed. 1990) p. 1315. In the present

---

[7] The plaintiffs briefly suggest that "[t]he defendant's construction would make the [petroleum franchise act] effectively coextensive with the PMPA. We submit that construction is totally illogical—not only because the legislature manifestly did not copy the entire PMPA section, but because if they had, the likelihood of preemption increased dramatically."

Title 15 of the United States Code, § 2806 (a) (1), provides: "To the extent that any provision of this subchapter applies to the *termination (or the furnishing of notification with respect thereto) of any franchise,* or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) *with respect to termination (or the furnishing of notification with respect thereto) of any such franchise* or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship *unless such provision of such law or regulation is the same* as the applicable provision of this subchapter." (Emphasis added.)

The plaintiffs fail to expound on how construing the definition of retailer to be consistent with the definition contained in the PMPA increases the "likelihood of preemption," considering the express terms of 15 U.S.C. § 2806.

case, the court reasoned that, although the motor fuel is sold to the public, it is not sold by the plaintiffs but rather by the defendant. The defendant owns the motor fuel until such time as it is transferred to a motorist's tank. The plaintiffs may be agents of the seller, but they are not the seller. Thus, the court concluded that it is the defendant rather than the plaintiffs that is the retailer.[8] We agree with the trial court's analysis.

---

[8] The plaintiffs assert that two Superior Court decisions are instructive. First, in *Fenix Group*, *LLC* v. *GPM Investments*, *LLC*, Docket No. CV-18-6043242-S, 2023 WL 369986 (Conn. Super. January 17, 2023) (*Fenix*), the court concluded that there existed a franchise relationship between Fenix Group, LLC (Fenix), which operated a gasoline service station and convenience store, and GPM Investments, LLC (GPMI), the sole supplier of petroleum products for sale at the premises. Id., *1, 4. Pursuant to the parties' "consignment supply agreement," GPMI agreed to furnish Fenix with petroleum products to be sold from the premises, which entire premises were the subject of a "sublease agreement" between the parties. Id., *1. "From 2016 to early in 2018, Fenix operated a Valero gasoline service station and convenience store at the Bristol premises. GPMI was the sole supplier of petroleum products for sale there and set the prices at which those products were to be sold. Fenix had paid GPMI security deposits for rent due under the sublease and for gasoline provided under the supply agreement, and it was to pay GPMI rent for the premises on a monthly basis. GPMI was to pay Fenix a 'commission' on the sales of its products at the premises equal to two cents per gallon on those sales. . . . As the title of the supply agreement indicates, Fenix was selling gasoline and other petroleum products on consignment from GPMI." (Citation omitted.) Id.

In its statutory interpretation analysis, the court found important that the petroleum franchise act did not define "retailer," contrasting that undefined term with the requirement under the PMPA that a party must purchase motor fuel in order to constitute a retailer. Id., *3. The court understood the absence of a definition to mean that the petroleum franchise act "contains no similar requirement." Id. The court further considered that the petroleum franchise act also covered relationships involving the consignment of motor fuel, which the court found applicable to the parties' agreement. Id., *4. The court's analysis is not helpful to our decision in the present case because it was premised on contractual arrangements that differ significantly from the present case, including the lease of the entire premises and the existence of the consignment supply agreement.

The plaintiffs also urge this court to rely on *Seymour Foodmart*, *LLC* v. *Drake Petroleum Co.*, Docket No. CV-19-6061071-S, 2024 WL 94276 (Conn. Super. January 2, 2024) (*Seymour Foodmart*), in which

The parties also provide competing references to other Connecticut statutes.[9] "It is well established that the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires [this court] to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Internal quotation marks omitted.) *McCullough* v. *Swan Engraving, Inc.*, 320 Conn. 299, 311–12, 130 A.3d 231 (2016). The defendant directs

the Superior Court, in agreement with *Fenix*, found the petroleum franchise act's protections applicable to a relationship between a convenience store operator and the supplier of motor fuel, stating that *Fenix* presented "[a]nalogous facts" and agreeing with its holding. Id., *7. We disagree that *Fenix* presented analogous facts to *Seymour Foodmart*, in that, unlike in *Fenix*, "the plaintiff [in *Seymour Foodmart*] leased *a portion* of the premises from the defendant for the purpose of operating a convenience store." (Emphasis added.) Id., *2. In addition to the contractual differences, we find more persuasive the statutory interpretation employed by the trial court in the present case than that in *Fenix* and *Seymour Foodmart*.

[9] In addition to relying on Connecticut statutes, the plaintiffs contend that their construction of the term "retailer" is more consistent with other states' enactments, particularly Maine and New York. We disagree. The plaintiffs rely on *Webber Oil Co.* v. *Murray*, 551 A.2d 1371 (Me. 1988), in which the Maine Supreme Judicial Court held that a convenience store owner's claim against a distributor pursuant to the Maine Motor Fuel Distribution and Sales Act, Me. Stat. tit. 10, § 1451 et seq., was not preempted by the PMPA because of its broader scope. Id., 1373. Notably, the court held that the federal definition of "retailer" was narrower than the term used by the Maine legislature; id., 1374; which specifically defined "retail dealer" as "any person who operates a service station, filling station, store, garage or other place of business for the sale of motor fuel for delivery into the service tank or tanks of any vehicle propelled by an internal combustion engine." Me. Stat. tit. 10, § 1453. The plaintiffs also rely on a New York statute, N.Y. Gen. Bus. Law § 199-c (McKinney 2022). That statute, however, uses the term dealer, which it defines as "any person engaged in the retail sale of motor fuels for use in motor vehicles under a franchise entered into with a distributor." N.Y. Gen. Bus. Law § 199-a (a) (1) (McKinney 2022). The statutes relied on by the plaintiffs are examples of legislatures defining terms more expansively. As such, we do not find persuasive the plaintiffs' reliance on those statutes.

this court's attention to General Statutes § 14-319 (a), contained within the chapter of the General Statutes governing gasoline and motor oil sales, which prohibits the sale of gasoline without a license issued by the Commissioner of Consumer Protection. Specifically, § 14-319 (a) provides in relevant part: "No person shall sell or offer for sale any gasoline or other product intended for use in the propelling of motor vehicles using combustion type engines over the highways of this state without having applied for and received from the commissioner a license to sell such gasoline or other product. Each person applying for any such license shall, in such application, state the location of each place or station where such person intends to sell or offer for sale any such gasoline or other product. . . ." We agree with the defendant's contention that because this statute with a similar focus requires a person to hold a license to sell or offer for sale gasoline, its holding of the necessary license rather than the plaintiffs lends additional support to the notion that it is the retailer, not the plaintiffs.[10]

The plaintiffs place great emphasis on the addition of statutory language protecting consignment contracts. The plaintiffs contend that we must construe the statute to avoid rendering the word "consignment" surplusage. The defendant responds to the plaintiffs' consignment argument in two ways. It argues that the use of the term "consignment" within the statute is intended to apply only to specific "distributor-distributor consignment arrangement[s]." It also contends that the relationship between the two parties is not a consignment relationship. We agree with both of the defendant's responses.

First, as noted previously, the language of the petroleum franchise act was derived from the PMPA. The PMPA defines distributor as "any person, including any affiliate of such person, who—(A) purchases motor fuel for sale, consignment, or distribution to another; or (B)

---

[10] The plaintiffs' counsel was asked at oral argument before this court whether the plaintiffs hold the statutorily required licenses, and he responded that they do not.

receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation service for, such supplier." 15 U.S.C. § 2801 (6) (2018). "Longstanding precedent makes clear that the second definition of a distributor does not encompass an entity that receives fuel on consignment for sale to the public." *Sasoro 13, LLC* v. *7-Eleven, Inc.*, Docket No. 3:18-CV-03274-N (DCG), 2023 WL 2290788, *4 (N.D. Tex. February 27, 2023). Courts interpreting the PMPA have explained that "[t]he legislative history makes clear that in defining a distributor who operates under a consignment Congress had in mind an independent middleman acting as a jobber, *not a dealer selling to the public at retail.*" (Emphasis in original; internal quotation marks omitted.) *Farm Stores, Inc.* v. *Texaco, Inc.*, supra, 763 F.2d 1341; see also *Miller* v. *W.H. Bristow, Inc.*, 739 F. Supp. 1044, 1049 (D.S.C. 1990) ("the courts are in agreement that Congress intended to include within the definition of 'distributor' only a middleman and not one who sells products to the public at retail").

We remain persuaded that the relationship in the present case does not constitute a consignment, even if the petroleum franchise act's use of the term consignment is not limited to the relationship described in cases interpreting the PMPA. Black's Law Dictionary defines consignment in part as "[e]ntrusting of goods to another to sell for the consignor. A bailment for sale. The term 'consignment', used in a commercial sense, ordinarily implies an agency and denotes that property is committed to the consignee for care or sale." Black's Law Dictionary, supra, p. 307. The plaintiffs argue that "[t]he Commissioned Agent Agreement in this case is a classic example of a 'true consignment' arrangement under which a product (motor fuel) is delivered to a merchant/retailer (the plaintiff[s]) primarily engaged in selling motor fuels to retail consumers." As part of their argument that their construction of the term consignment is consistent with the term's use in other Connecticut

statutes, the plaintiffs direct this court's attention to the chapters of our general statutes governing artist-art dealer consignments and pawnbrokers and secondhand dealers. We are not persuaded that these other statutes support the plaintiffs' position that the contractual relationship in the present case constitutes a consignment.

First, the artist-art dealer consignment statute defines consignor as a person "who delivers a work of fine art to an art dealer for the purpose of sale . . . to the public on a commission or fee or other basis of compensation"; General Statutes § 42-116k (c); and consignee as a person "who receives and accepts a work of fine art from a consignor for the purpose of sale . . . to the public on a commission or fee or other basis of compensation." General Statutes § 42-116k (d). Second, the pawnbrokers and secondhand dealers statute defines " '[c]onsignment shop operator' " as "a person who is primarily engaged in the business of selling personal property as the agent of another person who has placed such property in the physical possession of the agent when such other person has not been paid for such property, retains legal title to such property and bears the risk of loss until such property is sold to a third person." General Statutes § 21-39a (7). Moreover, the defendant directs this court's attention to article 9 of the Uniform Commercial Code, codified at General Statutes § 42a-9-101 et seq., which defines " '[c]onsignment' " as "a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale . . . ."[11] General Statutes § 42a-9-102 (a) (20). The relevant definitions set forth in each of these statutes have an element of possession. Specifically, the consignee "receives and accepts" the artwork; General Statutes § 42-116k (d); the consignment shop operator must act as the agent of another "who has placed such property in the physical possession of the agent"; General Statutes § 21-39a (7); and the transaction must involve

---

[11] General Statutes § 42a-9-102 (a) (19) defines " '[c]onsignor' " as "a person that delivers goods to a consignee in a consignment," and § 42a-9-102 (a) (21) defines " '[c]onsignee' " as "a merchant to which goods are delivered in a consignment."

"a person deliver[ing] goods . . . ." General Statutes §42a-9-102 (a) (20).

The plaintiffs contend that, although "possession or control is not a dispositive consideration, the stipulated evidence establishes that the plaintiffs had, and must have had, both possession and control of the motor fuel in order to consummate sales." They point to various provisions of the Commissioned Agent Agreement, including that the plaintiffs are required to hold the fuels and "[hold] in trust" the proceeds of the sales, are responsible for monitoring the dispensing of fuel, must employ employees, and must utilize equipment to effect the sales. The plaintiffs highlight provisions of the Commissioned Agent Agreement that state that they are responsible for damage to equipment or losses of fuel under certain circumstances and that they are responsible for environmental monitoring and recording of volumes.[12]

The defendant maintains that, "[a]s commissioned agents, the plaintiffs maintain limited duties related to the sale of petroleum at the sites. Those duties relate

---

[12] Specifically, the plaintiffs identify the following provisions: "All such motor fuels shall be and remain the property of Owner until sold to retail customers, and the proceeds therefrom shall be and remain the sole property of Owner and shall be held in trust by Agent for the benefit and account of Owner"; "[t]he agent is responsible at all times to monitor, supervise, and generally oversee the dispensing of all motor fuel by each customer"; "[a]gent shall conduct the entire business of selling the motor fuels at the Service Station for the account of Owner"; "[a]gent shall utilize the Motor Fuel Equipment in a prudent and businesslike manner solely for the purpose of advertising, handling, storing or otherwise facilitating the sale of motor fuels supplied by Owner at each Service Station"; "[i]n the event of a 'Drive-off' that results in damage to the gasoline dispenser or attachments or any equipment owned by Owner, it is solely the Agent's responsibility to obtain license and insurance information from the customer and report the 'drive off' to the police immediately. Drive offs are solely the responsibility of the Agent"; "[o]wner acknowledges that in order for Agent to sell motor fuels at the Service Station, it will be necessary for Agent to employ employees, who shall be employees of Agent and shall not be employees of Owner"; and "[a]gent shall keep a true record of all motor fuels at the Service Station . . . ."

specifically to the point of sale transactions, meaning the actual receipt of payment from customers, changing the price of gas at the direction of [the defendant], and providing certain reports to [the defendant] from the site." The defendant directs this court to other provisions of the Commissioned Agent Agreement, including: the agent "has leased a portion of the Property . . . for the purpose of operating a convenience store" and "a portion of the Property . . . not being leased to the Agent is presently being used by the [defendant] for the sale of motor gasoline and other motor fuels"; the plaintiffs have "agreed to act as [the defendant's] Commissioned Agent[s] in respect of [the defendant's] operation of the Service Station"; the plaintiffs sell the gasoline "for the account of [the defendant]"; the defendant "has provided each Service Station with certain improvements, structures, appliances, equipment, underground tanks and other personal property to facilitate the sale of the motor fuels"; the defendant "shall be responsible for maintenance, repairs and replacement of [such] Motor Fuel Equipment" except under certain circumstances; the defendant "shall deliver motor fuels to the Service Station at such time or times as [the defendant] determines in its sole discretion"; the defendant "retains the right at any time . . . to change the brand of motor fuels sold at any Service Station"; and the defendant is responsible for maintaining the licenses or permits necessary to sell motor fuels and for complying with all laws and regulations relating to the quality and specifications of the motor fuels and motor fuel equipment.[13]

Considering the Commissioned Agent Agreements as a whole, we are not persuaded by the plaintiffs' claim that

---

[13] Paragraph 8 of the Commissioned Agent Agreement provides: "Owner shall maintain, in its own name, any and all licenses or permits necessary to sell motor fuels at each Service Station and shall comply with all present and future laws and regulations relating to the quality and specifications of motor fuels and the Motor Fuel Equipment, postage of octane levels, vapor recovery and other matters which arise in connection with maintenance of the Motor Fuel Equipment and sales of motor fuels at the Service Station, except that Agent shall be responsible for providing immediate notice to Owner of any non-compliance

they take possession and control of the motor fuels such that they receive the fuel on consignment. We agree with the defendant's construction of the parties' contractual arrangement in which the plaintiffs' responsibilities are limited to facilitating the sale of the motor fuels, which remain in the possession and control of the defendant from delivery to the service station until the motor fuel is dispensed to the customers. In other words, the motor fuel is deposited into the defendant's tanks by the defendant, it passes through the defendant's equipment, and it is sold directly to retail customers. The plaintiffs primarily collect the funds generated by the prices set by the defendant. Accordingly, the Commissioned Agent Agreements are not consignment agreements.

Moreover, although neither dispositive nor directly implicated by the present appeal, acceptance of the plaintiffs' contention that they are franchisees and the defendant is a franchisor necessarily would place the defendant in violation of the petroleum franchise act based on the terms of the Commissioned Agent Agreement.[14] The agreement provides that the defendant "shall have sole responsibility to establish the retail prices at its discretion for motor fuels sold at the Service Station, and [the plaintiffs] shall sell motor fuels at the retail prices so established by [the defendant], and shall change retail prices upon notice from [the defendant] . . . ." In other words, the defendant is entitled to set the price for the sale of gasoline. Pursuant to § 42-133*l* (f), "[n]o franchisor, directly or indirectly, through any officer, agent or employee, shall do any of the following . . . require or coerce a gasoline franchisee to sell gasoline at a specific price or in a specific price range." The defendant argues

of which Agent is aware, and of any claim or notice of non-compliance received by Agent or by Agent's employees from any federal, state or local government authorities, and Owner shall hold Agent harmless from any claims or damages for any failure by Owner to comply with such laws and regulations, unless any such non-compliance is attributable to Agent's failure to perform its obligations under this Paragraph 8."

[14] During oral argument before this court, counsel for both parties agreed that the petroleum franchise act prohibits a franchisor from setting the price of gasoline to be sold.

that: "If the plaintiffs were deemed to be retailers under the statute, it would create a situation in which the plaintiffs were allowed to set the price and sell a product that never belonged to [them] and that [the defendant] had purchased. This absurd result cannot be what the General Assembly intended."

Because the plaintiffs are not "retailers" within the meaning of the petroleum franchise act, there is no franchise relationship entitling them to protection under that act. Accordingly, the court properly rendered judgment in favor of the defendant.

The judgment is affirmed.

In this opinion MOLL, J., concurred.